UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In the matter of the Complaint of
MOTOR DEPOT, LLC, as Owner of a
2006 Black Hawk Vessel with Hull
ID Number IT030015G506, its
Engines, Tackle, Apparel, and
Appurtenances, etc. for Exoneration
from or Limitation of Liability

Case No.: 8:21-cv-2941-WFJ-TGW

   Petitioner.
_____/

## ORDER

Before the Court is Tamara Nasser and Nasr Alghrairi's (collectively "Claimants") Motion for Summary Judgment and Relinquishment of Jurisdiction to State Court (Dkt. 37). Petitioner Motor Depot, LLC ("Motor Depot") has responded in opposition (Dkt. 48). Claimants have not replied. Upon careful consideration, the Court grants Claimants' Motion.

## BACKGROUND

This admiralty action arises from an incident in the waters of Tampa Bay, Florida. On June 13, 2020, Ben Bengelloun—an owner and managing partner of Motor Depot—took six passengers for a test ride on a 2006 Black Hawk vessel (the "Vessel"). As Mr. Bengelloun captained the Vessel back from its initial stop, the bow started to porpoise and violently bounce. Claimants were sent airborne before landing back in the Vessel, resulting in serious injury.

## I.     Factual History

Claimants met Mr. Bengelloun approximately one week before the incident at a restaurant in Tampa, Florida. Dkt. 38-1 at 41. Upon learning that Mr. Bengelloun sold recreational crafts, Claimants expressed their interest in buying one. *Id.* at 43. Mr. Bengelloun invited Claimants to take the Vessel out the following weekend. *Id.*

On June 13, 2020, Claimants took Mr. Bengelloun up on his offer. They were joined by Meral Badawy (a friend of Claimants), "Armine" (a mutual friend of Claimants and Mr. Bengelloun), and two other individuals—Shankar Manupati and "Tony" (guests of Mr. Bengelloun).[1] *Id.* at 50, 56–57. The group boarded the Vessel and headed to "Beer Can Island" at around three in the afternoon. *Id.* at 50.

The ride to Beer Can Island was uneventful. Claimants and Ms. Badawy sat in the fore of the Vessel while the other passengers sat in the aft behind Mr. Bengelloun, who primarily remained at the helm. *Id.* at 61–62. According to Claimants, the group drank alcoholic beverages provided by Mr. Bengelloun and listened to music as they enjoyed the ride. *Id.* at 64–67. Mr. Bengelloun denies that he personally drank or provided any alcohol. Dkt. 38-3 at 26–28.

---

[1] Multiple members of this group appear to go by different names among different people, as reflected in the deposition transcripts. "Armine" (last name unknown) is sometimes referred to as "Emine," "Ami," or "Alex." Dkt. 38-2 at 21; Dkt. 38-3 at 26. The Court will only use the name "Armine." "Tony" (last name unknown) is sometimes referred to as "Ali." Dkt. 38-2 at 20. The Court will only use the name "Tony." Shankar Manupati goes by "Manuel" and "Manu." Dkt. 38-3 at 25, 77. The Court will refer to him as "Mr. Manupati."

After a short stop at Beer Can Island, the Group agreed to dinner at a boat-accessible restaurant near downtown Tampa. Dkt. 38-1 at 78. Armine raised the anchor, and everyone returned to the seating arrangement described above.[2] *Id.* at 78–79. There is some disagreement concerning the exact condition of the water and wind. Claimants and Mr. Bengelloun nevertheless agree that the water was relatively calm and that the weather was good for boating. *Id.* at 83; Dkt. 38-3 at 38–39.

Once in open waters, Mr. Bengelloun began to speed up. No one remembers the Vessel's exact speed at this point, but Claimants maintain that the bow of the Vessel "started picking up air" and "bouncing vertically . . . up and down" as a result of Mr. Bengelloun's acceleration or speed. Dkt. 38-1 at 84. This went on for "a few minutes." *Id.* Mr. Bengelloun allegedly "maintained the speed" despite Mr. Alghrairi's attempts to communicate with him "through hand signals telling him to slow down." *Id.*

Claimants allege that they were sitting down and "holding onto the [side and front] rails" when the Vessel experienced its first "big bounce." *Id.* at 88. Claimants held on, but the following bounce was even more violent, causing Claimants to pick up air and collide with the Vessel upon landing. *Id.* Ms. Nasser had "released her hand" from the side rail due to injury or pain by the time the next bounce came. *Id.*

---

[2] There is some ambiguity concerning Armine's precise relation to Mr. Bengelloun. Mr. Manupati claims that Armine works for Mr. Bengelloun at Motor Depot. Dkt. 38-2 at 22. Mr. Bengelloun denies that Armine is a Motor Depot employee. Dkt. 38-3 at 29.

According to Claimants, "the third bounce sent everyone airborne, and the [Vessel] itself was airborne" as well.[3] *Id.* at 88–89.

The resulting impact caused significant injury to Claimants. Notably, Ms. Nasser suffered "a compound fracture in her leg[.]" *Id.* at 99. Her "tibia and fibula were both protruding from her skin" and "there was plenty of blood." *Id.* at 99, 101. Mr. Alghrairi—who was also allegedly injured—tended to Ms. Nasser's leg and improvised a cast from materials on the Vessel. *Id.* at 100. Meanwhile, Mr. Bengelloun set a course for Tampa General Hospital.

Upon arriving outside of Tampa General Hospital, the Vessel experienced an allision as Mr. Bengelloun attempted to find the correct location to drop off Claimants.[4] *Id.* at 101. Paramedics arrived soon thereafter and loaded Ms. Nasser onto a medical vehicle. *Id.* at 102. Mr. Nasser sought medical attention for his own injuries days later. *Id.*

---

[3] Mr. Bengelloun described the event as follows:

> I was going on a reasonable speed and suddenly, you know, like, I mean the boat lifted. Once it lifted, by lifted – like a big lift, you know, never encountered something like that, and drop again. But as soon as it lifted, I tried to control the boat, put it on neutral, you know, like, I mean – and it went down, and again another time. That's like a sneaker wave that did that. I tried to control the boat, you know, like I got it to stop.

Dkt. 38-3 at 47.

[4] Mr. Alghrairi claims that Mr. Bengelloun "smashed the boat into the concrete wall around the Tampa Bay area, and then he realized that he went off to the [wrong ramp.]" Dkt. 38-1 at 101. Mr. Bengelloun claims that he "touch[ed] a pillar[,]" which resulted in "no damage to the Vessel." Dkt. 38-3 at 14, 50.

4

## II. Procedural History

On December 17, 2021, Motor Depot filed a Complaint for Exoneration from or Limitation of Liability against Claimants and Ms. Badawy for injuries sustained onboard the Vessel during the June 13, 2020, incident. Dkt. 1. Motor Depot subsequently moved for entry of an order approving a $21,250 security, directing issuance of monition, and restraining prosecution of claims beyond those in the instant action. Dkt. 13. The Court granted Motor Depot's motion on March 25, 2022. Dkt. 14.

On May 27, 2022, Claimants answered and brought personal injury claims against Motor Depot in its capacity as the limitation petitioner in the instant action. Dkts. 19 & 20. Claimants now request: 1) summary judgment dismissing Motor Depot's Exoneration from or Limitation of Liability petition; and 2) relinquishment of jurisdiction over the underlying negligence action to state court. Dkt. 37.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A

fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine factual dispute. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). In addition, the Court must resolve any reasonable doubts in the non-moving party's favor. *Id.* Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

This admiralty and maritime action is controlled by 46 U.S.C. § 30505 (the "Limitation Act"). The Limitation Act "limits a vessel owner's liability for any damages arising from a maritime accident to the value of the vessel and its freight, provided that the accident occurred without such owner's 'privity or knowledge.'" *In re Schneider*, No. 2:21-CV-549-JES-KCD, 2022 WL 17104935, at *4 (M.D. Fla. Nov. 22, 2022) (quoting *Beiswenger Enters. Corp. v. Carletta*, 86 F.3d 1032, 1033–34 (11th Cir. 1996)). In determining whether the Limitation Act applies to a maritime tort, the presiding admiralty court generally conducts a two-step analysis that divides the burden of proof between the parties. *Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1062–63. (11th Cir. 1996). "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." *Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1563–64 (11th Cir. 1985) (citation and quotations omitted). If the claimant satisfies his or her initial burden of proving negligence or unseaworthiness, the burden shifts to the shipowner to prove lack of knowledge or privity. *Id.* at 1564.

"A vessel owner's claim to limited liability must be adjudicated exclusively in [an] admiralty court, which sits without a jury." *Suzuki*, 86 F.3d at 1063 (citations

omitted). Notwithstanding, "the same statute that grants the federal courts exclusive admiralty and maritime jurisdiction saves to suitors 'all other remedies to which they are otherwise entitled.'" *Id.* (quoting 28 U.S.C. § 1333(1)). Given this, an admiralty court "may decide the privity or knowledge issue without first deciding the liability issue—at least where the boat owner concedes privity or knowledge, or where it is otherwise impossible under any set of circumstances for the vessel owner to demonstrate the absence of privity or knowledge." *Id.* at 1064. Limitation of liability is impossible under the Limitation Act in such cases; and, "where no limitation is possible[,] the damage claimants are entitled to have the injunction against other actions dissolved, so that they may, if they wish, proceed in a common law forum as they are entitled to do under the saving to suitors clause [(28 U.S.C. § 1333(1))]." *Id.* at 1063–64 (quoting *Fecht v. Makowski,* 406 F.2d 721, 722–23 (5th Cir. 1969)).

With these principles in mind, the Court turns to the privity or knowledge issue presented by the instant case. "If it is truly impossible under any set of circumstances for [Motor Depot] to establish its lack of privity or knowledge, the limitation action should be dismissed, and [Claimants] should be allowed to try liability and damages issues in state court." *Id.* at 1064.

Privity or knowledge under the Limitation Act can be actual or constructive. Actual privity or knowledge "generally refers to the vessel owner's personal participation in, or actual knowledge of, the specific acts of negligence or conditions

8

of unseaworthiness which caused or contributed to the accident." *Id.* Constructive privity or knowledge generally refers to what the vessel owner "is charged with discovering in order to apprise himself of conditions likely to produce or contribute to a loss." *Hercules*, 768 F.2d at 1564. "In the context of a corporate shipowner, the privity and knowledge of 'corporate managers vested with discretionary authority' is attributed to the corporation." *Suzuki*, 86 F.3d at 1064 (citations omitted).

That being the case, there are no circumstances under which Motor Depot could demonstrate the absence of privity or knowledge concerning whatever negligent acts or unseaworthy conditions (if any) caused or contributed to the June 13, 2020, incident.[5] Mr. Bengelloun is the co-owner and only functional managing partner of Motor Depot. Dkt. 38-3 at 7–9. Mr. Bengelloun drove the Vessel to the public dock from which he himself launched the Vessel. *Id.* at 25. And all parties agree that Mr. Bengelloun was the only person who operated the Vessel after its departure from Beer Can Island. Mr. Bengelloun therefore necessarily had actual or constructive privity or knowledge of whatever negligent acts or unseaworthy conditions (if any) caused or contributed to Claimants' injuries.[6] The Court must

---

[5] "The shipowner's privity or knowledge is not measured against every fact or act regarding the accident; rather, privity or knowledge is measured against the specific negligent acts or unseaworthy conditions that actually caused or contributed to the accident." *Suzuki*, 86 F.3d at 1064 (citations omitted).

[6] Mr. Bengelloun's only argument to the contrary is that there could have been "some type of heretofore unknown latent or mechanical defect in the Vessel for which [Mr. Bengelloun] and Motor Depot had no knowledge of." Dkt. 48 at 17. Mr. Bengelloun, as the co-owner and sole managing partner of Motor Depot, is charged with discovering such conditions of

9

charge Motor Depot with the same. *See Hercules,* 768 F.2d at 1574 (finding that, "in the context of a corporation, 'privity and knowledge' means the privity and knowledge of a managing agent, officer or supervising employee, including supervisory shoreside personnel").

It follows that there are no issues bearing on Motor Depot's liability under the Limitation Act. This is true even if there is a genuine issue of material fact concerning whether Mr. Bengelloun was negligent or the Vessel was unseaworthy; for, if these predicates do exist, Motor Depot would not be entitled to a limitation of liability, and, if they do not exist, Motor Depot will be found not liable by the state court that Claimants "should be allowed to try liability and damages issues" before. *Suzuki*, 86 F.3d at 1064. The Court therefore grants Claimants' Motion.

## CONCLUSION

Motor Depot is not entitled to exoneration or limitation of liability under the Limitation Act.[7] Claimants may litigate negligence in state court before a jury.

---

unseaworthiness. *See Avera v. Fla. Towing Corp.*, 322 F.2d 155, 166 (5th Cir. 1963) ("knowledge means not only personal cognizance but also the means of knowledge—of which the owner or his superintendent is bound to avail himself—of contemplated loss or condition likely to produce or contribute to loss, unless appropriate means are adopted to prevent it"). Accordingly, even under Mr. Bengelloun's theory, Mr. Bengelloun had constructive knowledge of whatever unseaworthy condition (if any) caused the accident. *See Hercules*, 768 F.2d at 1564.

[7] "The Limitation Act was designed to encourage investment in the shipping industry by limiting the physically remote shipowner's vicarious liability for the negligence of his or her water-borne servants." *Suzuki*, 86 F.3d at 1064 (citing *Tittle v. Aldacosta,* 544 F.2d 752, 756 (5th Cir.1977)). Accordingly, "[f]or his own fault, neglect, and contracts[,] the owner remains liable." *Am. Car & Foundry Co. v. Brassert*, 289 U.S. 261, 264 (1933) (citation omitted). The Limitation Act was not designed to limit Mr. Bengelloun's liability in these circumstances.

10

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

(1) Claimants' Motion for Summary Judgment and Relinquishment of Jurisdiction to State Court (Dkt. 37) is **GRANTED**.

(2) The Court's injunction against other actions (Dkt. 14) is dissolved.

(3) The Clerk is directed to enter final judgment in favor of Claimants Tamara Nasser and Nasr Alghrairi against Petitioner Motor Depot.

**DONE AND ORDERED** at Tampa, Florida, on April 27, 2023.

>  */s/ William F. Jung*
> **WILLIAM F. JUNG**
> **UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record